**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**

**SHERMAN DIVISION**

| | |
|---|---|
| STEPHEN McCORD,<br><br>Plaintiff,<br><br>v.<br><br>CHAD WILLIS; ADAM GAUER; CORY WILLIS; and NOEL A. ROSE,<br><br>Defendants. | Civil Action No.<br><br>**PLAINTIFF STEPHEN McCORD'S COMPLAINT AND JURY DEMAND** |

Plaintiff Stephen McCord, for his Complaint against Defendants Chad Willis, Adam Gauer, Cory Willis, and Noel A. Rose, alleges as follows.

## I. BACKGROUND

1. Between October 2023 and June 2025, Plus Brand Industries Inc. and its founder, Chad Willis, took at least $3,000,000 from Stephen McCord, a Texas investor. In exchange, Plus Brand sold him royalty investment units, a promissory note bearing 22 percent annual interest, and millions of shares of preferred stock. Willis told Mr. McCord that the deal carried "absolutely no risk" and would "make 100X in the next six months."

2. Mr. McCord has received $90,000. His royalties were supposed to equal his share of 10 percent of Plus Brand's product sales, and Plus Brand was required to send him monthly reports showing those sales. Instead, it sent five statements in 2024 that left the sales column blank and described each payment as a "baseline monthly return." The electronic copies of those statements contain a "Gross Sales" figure for each month, set in white text that does not appear on the page. In every month, that hidden figure equals the number of royalty units sold multiplied by the $25,000 unit price. The number Plus Brand withheld from Mr. McCord was the

amount of money it had raised from investors. Plus Brand has paid no royalties for any month after May 2024.

3. The preferred stock fared no better. Willis promised Mr. McCord 8,000,000 preferred shares with his first investment, and Plus Brand later signed four more agreements selling him additional shares. Yet the capitalization table Plus Brand supplied to its own valuation firm in 2025 lists no preferred stock at all and does not list Mr. McCord. Months later, a Plus Brand executive assured Mr. McCord in writing that the Company's "records confirm" his "15% preferred stock."

4. In March 2025, Plus Brand emailed Mr. McCord a press release announcing that the boxer Floyd Mayweather Jr. had completed a "$30 million" equity investment in the Company, which the release called "the first time that Plus Brand® has taken in meaningful outside capital." Two months later, Plus Brand's Chief Operating Officer wrote to Mr. McCord that the cash investment had "not yet been completed," and less than a month after that, Plus Brand sold him more preferred stock. On October 21, 2026, Willis wrote that "[t]here has been no $10 million or $15 million investment in the company" and that "[t]he company has had no revenue since its last communication to shareholders."

5. Neither Plus Brand nor any Defendant was registered to sell securities in Texas, where Mr. McCord lived when he bought. Willis, who solicited him, had been convicted of a felony that Michigan's financial regulator found involved fraud, dishonesty, or breach of trust. The man who brought Mr. McCord the deal, Defendant Noel A. Rose, appeared on Plus Brand's website as its "Global Ambassador of Investor Relations." Rose is barred by the Financial Industry Regulatory Authority, and Willis has since said that he paid Rose about $1,000,000 over three years. No one told Mr. McCord any of these facts before he invested.

6. Mr. McCord brings this action against Willis; Adam Gauer, Plus Brand's co-founder and Chief Operating Officer; Cory Willis, one of its executive officers and directors; and Rose. His claims arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5, the Texas Securities Act, Texas's statute on fraud in stock transactions, and the common law. He seeks rescissory relief or, in the alternative, damages, together with his attorney's fees and costs.

7. Plus Brand is not a defendant. Its royalty and preferred stock agreements with Mr. McCord select courts in Wyoming for disputes arising from them, and Mr. McCord has sued Plus Brand there, together with the Defendants named here, in *McCord v. Plus Brand Industries Inc.*, No. 1:26-cv-00333 (D. Wyo. filed Oct. 29, 2026) (the "Wyoming Action"). Mr. McCord brings this action to preserve his claims against the Defendants in the district where those claims arose.

## II. PARTIES

8. Plaintiff Stephen McCord is an individual who resides in Flower Mound, Denton County, Texas, and is a citizen of Texas. He resided in Texas when he made each investment described in this Complaint.

9. Non-party Plus Brand Industries Inc. ("Plus Brand" or the "Company") is a corporation organized under the laws of Wyoming with an address of record at 30 N. Gould Street, Suite 3602, Sheridan, Wyoming 82801. Plus Brand conducts its business from 1439 E. 11 Mile Road, Madison Heights, Michigan 48071, which is its principal place of business.

10. Defendant Chad Willis ("Willis") is Plus Brand's founder, President, and Chief Executive Officer. He signed every agreement between Plus Brand and Mr. McCord and made or approved the statements described below. On information and belief, Willis resides in Ortonville, Michigan, and is a citizen of Michigan.

11. Defendant Adam Gauer is a co-founder of Plus Brand and was its Chief Operating Officer at all relevant times. Plus Brand's amended Form D, filed May 9, 2024, identifies him as an executive officer and a director of the Company. He signed each royalty statement Plus Brand sent to Mr. McCord in 2024 and wrote the May 23, 2025 and October 31, 2025 emails described below. On information and belief, Gauer resides in Surrey, British Columbia, Canada, and is a citizen of Canada.

12. Defendant Cory Willis is identified as an executive officer and a director of Plus Brand in the Company's amended Form D, filed May 9, 2024. Plus Brand's corporate deck presented him to prospective investors, including Mr. McCord, as an "Advisory Board Member" on its "Management Team." On information and belief, Cory Willis resides in Ortonville, Michigan, and is a citizen of Michigan. Because Cory Willis shares a surname with Willis, this Complaint refers to him only by his full name.

13. Defendant Noel A. Rose solicited Mr. McCord's investments in Plus Brand. Rose has held himself out as the Chief Executive Officer and President of Royalty International Insurance Alliance Corp. and, on Plus Brand's website, as Plus Brand's "Global Ambassador of Investor Relations, Sports and Entertainment." On information and belief, Rose resides in Pembroke Pines, Florida, and is a citizen of Florida.

## III. JURISDICTION AND VENUE

14. This Court has subject-matter jurisdiction over Counts I and II under 28 U.S.C. § 1331 and Section 27(a) of the Exchange Act, which gives the federal district courts "exclusive jurisdiction of violations of" the Exchange Act and the rules under it. 15 U.S.C. § 78aa(a).

15. The Court has supplemental jurisdiction over Counts III through VIII under 28 U.S.C. § 1367(a). Those counts arise from the same investments, documents, and communications as Counts I and II and form part of the same case or controversy.

16. Independently, the Court has jurisdiction over every count under 28 U.S.C. § 1332(a)(1) and (a)(3). Mr. McCord is a citizen of Texas, no Defendant is a citizen of Texas, Gauer is a citizen of Canada, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

17. Section 27(a) of the Exchange Act authorizes service of process on each Defendant "wherever the defendant may be found." 15 U.S.C. § 78aa(a). Each Defendant has sufficient contacts with the United States as a whole, so the Court has personal jurisdiction over each Defendant on Counts I and II. Gauer, though he resides in Canada, served as Chief Operating Officer of a company that operates from Michigan, signed the royalty statements Plus Brand sent to Mr. McCord in Texas, and wrote to him there. The Court has personal jurisdiction over each Defendant on the remaining counts because those counts arise from the same nucleus of operative fact as Counts I and II.

18. Independently, each Defendant is subject to specific personal jurisdiction in Texas. Fed. R. Civ. P. 4(k)(1)(A); Tex. Civ. Prac. & Rem. Code § 17.042. Each Defendant purposefully directed the conduct on which Mr. McCord sues at a Texas resident in Texas, and Mr. McCord's claims arise from that conduct:

(a) Willis emailed Mr. McCord in Texas, including on October 30, 2023, when he answered Mr. McCord's questions and urged him to invest, and on November 3, 2025 and October 21, 2026. He took part in telephone calls with Mr. McCord, who was in Texas, during the first six months of their dealings. And he countersigned, for Plus Brand, every agreement under which Mr. McCord, a Texas resident, bought its securities.

(b) Gauer signed the five royalty statements that Plus Brand sent to Mr. McCord in Texas between February and June 2024, and he wrote the May 23, 2025 update and the October 31, 2025 email that Mr. McCord received there.

(c) Cory Willis, an executive officer and director of Plus Brand, was presented as a member of its “Management Team” in the corporate deck sent to Mr. McCord in Texas while he was deciding whether to make his first purchase.

(d) Rose solicited Mr. McCord’s investments in telephone calls and emails that Mr. McCord received in Texas, including his October 30, 2023 email offering Mr. McCord preferred stock as “a special offer to you only.”

19. Venue is proper in this District and Division under 15 U.S.C. § 78aa(a) and 28 U.S.C. § 1391(b)(2) and (c)(3). Acts and transactions constituting the violations alleged here occurred in this District. Defendants directed their solicitations, misrepresentations, and offers to Mr. McCord at his home in Flower Mound, Denton County, Texas, where he received them, and Mr. McCord made each purchase from there. For the same reasons, a substantial part of the events giving rise to Mr. McCord’s claims occurred in this District. Gauer, who does not reside in the United States, may also be sued in any judicial district. Denton County lies in the Sherman Division. 28 U.S.C. § 124(c)(3).

## IV. FACTUAL ALLEGATIONS

### A. Plus Brand’s royalty offering

20. Plus Brand raises money by selling royalty investment units (“Units”) under a series of private placement memoranda. Mr. McCord bought Units under memoranda dated January 9, 2023, April 16, 2024, August 2, 2024, and March 18, 2025 (each, the “Memorandum”). Each Unit costs $25,000. Each buyer signs a Subscription & Royalty Investment Agreement (a “Royalty Agreement”).

21. On January 12, 2023, Plus Brand filed a Form D with the Securities and Exchange Commission for a $10,000,000 offering under Rule 506(c). The filing gave the Company's address as 30 North Gould Street, Sheridan, Wyoming, and identified Willis as a director and its only related person. On May 9, 2024, Plus Brand filed an amended Form D that increased the offering to $50,000,000 and reported $6,775,000 in sales, with the first sale on April 17, 2023. The amendment gave the Company's address as Madison Heights, Michigan, and identified Willis, Gauer, and Cory Willis each as an executive officer and a director. Willis signed both filings. Both describe the securities offered only as "Royalty Units," so neither covers the preferred stock or the Note that Plus Brand later sold to Mr. McCord. Both also report that no non-accredited investor had invested, that no one received compensation for selling the Units, and that Plus Brand paid no sales commissions or finders' fees.

22. Each Royalty Agreement provides that Plus Brand "shall pay Royalties to the Subscriber and the other Subscribers in an aggregate amount equal to ten percent (10%) of the Company's Gross Sales until the Subscriber has received" the amount of its investment plus "a return equal to twenty-two percent (22%) per annum on the Investment Amount or any unreturned portion of the Investment Amount." Each subscriber's share of the monthly royalties equals the royalties for that month multiplied by the subscriber's Units and divided by the total Units outstanding. "Gross Sales" means "the cash revenues actually received by the Company (and not merely accrued) that result from all product sales made by the Company," net of discounts, credits, returns, and charge-backs.

23. Royalties are due by the fifteenth day after the end of each month. Within 45 days after each quarter, "the Company's independent public accountants will formally review the

Company's books and records" to determine the royalties that should have been paid, and the Company must then adjust its payments up or down to match.

24. The Royalty Agreement also provides: "Monthly financial reports will be delivered by the Company to Investors showing (i) Gross Sales, (ii) total Royalty payments payable and (iii) Royalty payments payable to individual Subscribers."

25. In the Royalty Agreements Mr. McCord signed in October 2023 and January 2024, if Plus Brand closes an equity financing with gross proceeds of at least $10,000,000 before a subscriber has been repaid (a "Qualified Financing"), the subscriber may buy a pro rata share of the securities sold, and the Company must give written notice "not less than ten (10) days prior to the anticipated closing date of such financing."

26. Mr. McCord's later Royalty Agreements changed these terms. The May 2024 agreement raised the Qualified Financing threshold to $50,000,000. The January 2025 and June 2025 agreements replaced the right to participate with warrants that "may only be exercised" after an equity financing of at least $50,000,000, at an exercise price of 50 percent of the price in that financing.

27. The Royalty Agreement says the investment "will not constitute, or be deemed to constitute, (i) consideration for the purchase of capital stock of the Company," and that the subscriber "shall not be a shareholder of the Company."

28. Under the Royalty Agreement, the offering would close no later than December 31, 2023, and "subscriptions for Units received after the Offering Termination Date, will not be accepted." Plus Brand nonetheless sold Mr. McCord 20 more Units under the same Memorandum on January 29, 2024. The Royalty Agreements for his May 2024 and January 2025 purchases were issued under new memoranda but still recited the 2023 closing deadlines.

**B. Rose solicits Mr. McCord**

29. In October 2023, Ted DiBiase Jr. introduced Mr. McCord to Rose in South Carolina. Rose encouraged Mr. McCord to invest in Plus Brand, introduced him to Willis, and took part in telephone calls among Mr. McCord, Rose, and Willis during the first six months of Mr. McCord's dealings with the Company. Mr. McCord took those calls, and received Rose's and Willis's emails, in Texas.

30. Rose presented himself as part of Plus Brand. The Company's website identified him as its "Global Ambassador of Investor Relations, Sports and Entertainment" and listed his email address as noel@plusbrand.com. Plus Brand has since removed Rose from its website.

31. Neither Rose nor anyone at Plus Brand told Mr. McCord that FINRA had barred Rose, that Rose was not registered in Texas as a dealer or agent, or whether Rose would be paid for bringing investors to the Company.

32. Willis did not disclose his own history either. On March 23, 2005, Willis was convicted of a felony in the Circuit Court for Oakland County, Michigan, on two counts of possessing a motor vehicle with intent to pass false title and one count of false pretenses. In 2006, Michigan's Office of Financial and Insurance Services found that the conviction "involved fraud, dishonesty, or breach of trust" and entered an Order of Prohibition barring Willis from being "employed by, an agent of, or control person of" any licensee or registrant under Michigan's Mortgage Brokers, Lenders, and Servicers Licensing Act or any other financial licensing act. By its terms, the Order remains in effect until the Commissioner terminates, modifies, or sets it aside in writing. Neither Willis nor anyone at Plus Brand told Mr. McCord of the conviction or the Order.

33. In a telephone call on October 8, 2026, Willis told Mr. McCord that he had paid Rose about $1,000,000 over the previous three years to bring deals to the Company and to help

close them. In other calls, Willis complained to Mr. McCord that Rose had brought in investors who were not accredited and had told investors that Plus Brand would pay the taxes on the interest they received on their royalty investments. Plus Brand's own records identified Rose as a broker of its Units. Two of the royalty statements displayed in the royalty deck that Mr. McCord received on October 30, 2023, both issued to an investor who funded $350,000 on May 17, 2023, list "BROKER: Noel Rose." Yet the amended Form D that Willis signed on May 9, 2024 reports that no one received compensation for selling Plus Brand's Units and that Plus Brand paid no sales commissions or finders' fees. On information and belief, some or all of Plus Brand's payments to Rose compensated him for selling its securities. On information and belief, Willis also knew, or recklessly disregarded, that FINRA had barred Rose, a fact disclosed on FINRA's public BrokerCheck database.

34. On October 30, 2023, while he was deciding whether to invest, Mr. McCord emailed six questions to Rose. Among other things, he asked for "[c]urrent financials for Agua Plus," asked whether he was "getting 8 million shares in preferred stock if I invest $2 million," asked "[w]hat is the current valuation of the company now?," and asked for "a sample contract that I would sign for my investment."

35. Rose forwarded the questions to Willis, writing, "I am copying Chad on this email so we can get the PPM out." That same day, Rose wrote separately to Mr. McCord that he had asked Mr. DiBiase to send "the White Paper and the Deck which has all your answers," and added: "For the record, the stock is not in the deck and is a special offer to you only. There will be a separate addendum for that."

36. That same morning, at 11:41 a.m. Central time, Mr. DiBiase forwarded to Mr. McCord, with a copy to Rose, an email Rose had sent him on October 2, 2023. Rose's email

attached two Plus Brand presentations, a "Royalty Unit Investment Summary" and a "Corporate Deck" (together, the "Decks"), described the investment as "22% annually on diminishing principal," and said that Rose was "getting the exact language as it pertains to the stock purchase."

37. The Decks told Mr. McCord that the royalty investment was safe and was already paying. The royalty deck offered Units at $25,000 each with a "22% PER ANNUM RETURN," called the royalty "a cut-off-the-top that ensures you get paid first," and urged investors to "MITIGATE YOUR RISK." Under the heading "ROYALTY INVESTORS ARE ALREADY SEEING MONTHLY RETURNS," it displayed six royalty statements and two bank records for two existing investors. The corporate deck projected revenue of $286,861 for October 2023, more than $1,000,000 a month by early 2024, and $16,107,852 for the twelve months beginning October 1, 2023, and it closed with the words "MONTHLY ROYALTIES ARE ALREADY BEING PAID. DON'T MISS OUT!"

38. The statements in the royalty deck reported gross sales far below those projections, and they cannot be reconciled with one another. They report Plus Brand's gross sales as $27,304.80 for May 2023, $21,139.20 for June 2023, and $40,516.80 for July 2023, and a royalty pool equal to 10 percent of each figure. But the statements give different numbers of Units outstanding for the same month depending on which investor received them. For June 2023, Plus Brand paid one investor the entire $2,113.92 pool, treating his 10 Units as the only Units outstanding, and paid a second investor $1,233.12, treating 24 Units as outstanding. For July 2023, it paid the first investor the entire $4,051.68 pool across his two investments, treating 20 Units as outstanding, and paid the second investor $1,668.34, treating 34 Units as outstanding. The bank records the deck displayed confirm that Plus Brand wired those amounts.

Plus Brand thus paid out 158 percent of its royalty pool for June and 141 percent for July. On information and belief, it made up the difference with money raised from investors.

**C. Willis promises "absolutely no risk"**

39. At 12:26 p.m. Central time on October 30, 2023, Willis answered Mr. McCord's questions by email to Rose, with copies to Mr. McCord and Mr. DiBiase. Willis made these statements, among others:

(a) On projections: "Projected financials are in the company's deck. Currently, the company forecasts exceed those numbers by almost 100% or more."

(b) On the stock: "Yes, you are receiving 8,000,000 preferred shares in Plus Brand Industries Inc." Willis added, "You are gifted the shares and not paying for the shares," and "I am the only holder of preferred shares."

(c) On the return: royalty payments "are made monthly to all Royalty Holders based on 10% of the company's gross sales, giving you a 22% return on your money, with interest paid first," so that "[y]ou have a steady cash flow and also have an equity holding in the company."

(d) On valuation: "Truthfully, we are in the middle of our multiple patent valuations, expected to exceed one billion. Plus Brand is the only entity in the world with and using this technology; we created it. our stability and projected future is unlimited."

(e) On the offering: the investment documents could be found "by following the SEC-regulated steps for reviewing and registering on our governed platform."

(f) In closing: "Without any doubt, with everything I have, Stephen, this deal will make 100X in the next six months," and "This offer is a remarkable deal with absolutely no risk."

40. Willis did not send the current financial statements Mr. McCord had asked for.

41. Willis's statements were false and misleading when made. The deck to which Willis referred projected revenue of $286,861 for October 2023, while the most recent monthly gross sales Plus Brand had disclosed, for July 2023, were $40,516.80. A forecast nearly double the deck's projection was therefore a forecast of about fourteen times the Company's last reported monthly sales. On information and belief, Plus Brand's forecasts did not exceed the projections in its deck by "almost 100% or more," and no patent valuation "expected to exceed one billion" was under way. On information and belief, Plus Brand held no issued patent in October 2023. By Willis's own account, its U.S. patent on the scratch-ink technology was granted on May 6, 2025. And when Plus Brand commissioned a valuation ten months after Willis's email, the consultant valued its technology at about $25.8 million and the entire Company at $143.4 million. Plus Brand never issued or recorded the 8,000,000 preferred shares Willis promised (see Part IV.H). The royalty payments that followed were not based on 10 percent of product sales and did not produce a 22 percent return (*see* Part IV.F). And the investment was not free of risk. By Willis's own later account, the Company "exhausted the capital available to sustain" its beverage business, has survived for "about the last 18 months" on what he calls "extraordinary founder support" from himself and his wife, Giovanna, and "has had no revenue since its last communication to shareholders."

**D. Mr. McCord's purchases**

42. That evening, at 5:53 p.m. Central time, Mr. McCord signed a Royalty Agreement for 80 Units at a price of $2,000,000. Willis countersigned for Plus Brand two minutes later. Minutes after that, Mr. McCord and Plus Brand signed a Preferred Stock Subscription Agreement for 8,000,000 shares of Class A Preferred Stock at $0.25 per share, with the $2,000,000 price recited as paid by "CLIENT CREDIT (Plus Brand Royalty Subscription

Credit)," and a Joinder binding Mr. McCord to a Shareholders' Agreement dated March 1, 2021. Plus Brand billed Mr. McCord for the $2,000,000 under an invoice dated October 31, 2023 (No. 100110) and sent him account statements at his home in Flower Mound tracking his payments against it. He paid $200,000 on November 3, $800,000 on November 9, $250,000 on November 20, $300,000 on December 11, and $100,000 on December 15, 2023. He paid the remaining $350,000 by January 16, 2024, which Plus Brand's royalty statements give as the funding date of the investment.

43. Mr. McCord then made the following purchases from Plus Brand, each while he resided in Texas:

(a) January 29, 2024: 20 Units for $500,000.

(b) March 1, 2024: a second Preferred Stock Subscription Agreement and Joinder, for 8,000,000 shares at $0.25 per share, again paid by royalty credit. Plus Brand has never said whether this agreement re-documented the October 2023 subscription or was a separate issuance.

(c) May 23, 2024: 4 Units for $100,000, and 200,000 shares of preferred stock at $0.50 per share, paid by royalty credit.

(d) January 24 and 27, 2025: 14 Units for $350,000, under a Royalty Agreement signed January 27, 2025; 3,500,000 shares of preferred stock at $0.10 per share, paid by royalty credit; and the Promissory Note described in Part IV.E.

(e) June 16, 2025: 2 Units for $50,000, and 500,000 shares of preferred stock at $0.10 per share, paid by royalty credit.

44. In all, Mr. McCord paid Plus Brand at least $3,000,000 in cash for 120 Units, a total Plus Brand's own records confirm. He paid by wire to a Bank of America account in Lake Orion, Michigan, as the Royalty Agreements directed.

45. The Units, the preferred stock, and the Promissory Note are each a "security" under the Exchange Act, 15 U.S.C. § 78c(a)(10), and the Texas Securities Act, Tex. Gov't Code § 4001.068(a)(1).

46. Plus Brand did not offer the preferred stock under the Memorandum. As Rose told Mr. McCord, "the stock is not in the deck and is a special offer to you only." Each Preferred Stock Subscription Agreement warrants that the shares are duly authorized and, when issued, will be fully paid and nonassessable.

47. Plus Brand's documents contradict each other about what Mr. McCord bought and how he paid for it. The Royalty Agreements say that his investment is not consideration for capital stock and that he is not a shareholder. The Preferred Stock Subscription Agreements say that he bought the stock with "Royalty Subscription Credit."

48. On February 9, 2024, Plus Brand prepared, and later delivered to Mr. McCord, a certificate for 8,000,000 shares of Class A Preferred Stock in his name, numbered CA-10.

**E. The Promissory Note**

49. On January 24, 2025, Plus Brand issued Mr. McCord a Promissory Note (the "Note") in the principal amount of $2,950,000, bearing interest at 22 percent per year, "as per the Subscription and Royalty Investment Agreements sent on January 24th, 2025 and prior." The principal equals the sum of Mr. McCord's cash payments of $2,000,000, $500,000, $100,000, and $350,000.

50. The Note is payable "upon the receipt by the Company of an initial third party equity investment of $15,000,000." Its Events of Default include a breach of the Note's terms

that remains uncured for 20 days and "Termination of the business of the Company." On an Event of Default, Mr. McCord may declare the Note immediately due and sue to collect it, and Plus Brand must pay all costs of collection, including reasonable attorney's fees. Plus Brand waived presentment, demand, and notice. The Note is governed by Illinois law.

51. Eleven days before it issued the Note, Willis signed a term sheet with Mayweather Promotions, LLC, dated as of January 13, 2025. The term sheet was not binding, apart from its confidentiality and governing-law provisions. Under it, Mayweather Promotions would receive a warrant for 12,605,042 shares of preferred stock. The warrant would be exercised automatically in thirds, on each anniversary of its date, so long as Plus Brand had not terminated Floyd Mayweather Jr.'s brand ambassador agreement for cause. Mayweather's services were to consist of one photo, video, and voice session and one promotional event each year, four social media posts a year, and one social media story a month. Plus Brand would also give him unlimited products, refrigerators, and merchandise. The term sheet did not require Mayweather or Mayweather Promotions to pay Plus Brand any money.

**F. The royalty statements conceal Plus Brand's sales**

52. Plus Brand sent Mr. McCord five monthly "Royalty Investment Statements," dated February 2, March 4, April 5, May 3, and June 4, 2024. Each statement concerned his 80-Unit, $2,000,000 investment, and each bears Gauer's name as the "Authorized Signature."

53. Each statement has a column labeled "GROSS SALES." On the face of every statement, that column is blank, although the 2023 statements Plus Brand displayed in its royalty deck reported gross sales in the same column.

54. Each statement instead reports a "Royalty Payout Pool" and a payment to Mr. McCord, with this explanation: "This statement is based upon baseline monthly return for the month stated in the royalty period field above. This ensures continued cash-flow to investor

during the ebbs and flows of sales as we grow." The Royalty Agreements do not provide for a "baseline monthly return."

55. The statements report the following:

| Statement date | Royalty period | Payout pool | Units outstanding | Paid to Mr. McCord |
|---|---|---|---|---|
| Feb. 2, 2024 | January 2024 | $32,062.50 | 171 | $15,000 |
| Mar. 4, 2024 | February 2024 | $32,062.50 | 171 | $15,000 |
| Apr. 5, 2024 | March 2024 | $47,750.00 | 191 | $20,000 |
| May 3, 2024 | April 2024 | $47,750.00 | 191 | $20,000 |
| June 4, 2024 | May 2024 | $62,750.00 | 251 | $20,000 |

56. The payments did not track sales. In every month, the payment equals the pool multiplied by Mr. McCord's 80 Units and divided by the Units outstanding, to the dollar. The pool grew only as the number of Units sold grew. The Units outstanding rose from 171 to 191 in March 2024, after Mr. McCord bought 20 more Units on January 29, 2024, yet every statement paid him on 80 Units. On information and belief, Plus Brand counted his additional 20 Units in the denominator and paid him nothing on them.

57. The electronic files Plus Brand sent contain a figure in the "Gross Sales" column for each month, formatted in white text so that it does not appear on the page. The concealed figures are $4,275,000 for January and February 2024, $4,775,000 for March and April 2024, and $6,275,000 for May 2024. Each equals the number of Units outstanding that month (171, 191, and 251) multiplied by the $25,000 Unit price. The figure Plus Brand placed in the "Gross Sales" column, and then hid, was the amount of money it had raised from Unit investors. The payout pool in each month was a fixed percentage of that amount: 0.75 percent in January and February and 1 percent in March, April, and May.

58. On information and belief, Plus Brand's product sales did not support these payments, and Plus Brand paid Mr. McCord at least in part with money raised from investors, including later purchasers of Units. If Plus Brand's Gross Sales had in fact been as large as the concealed figures, 10 percent of them would have produced royalty pools ten to thirteen times larger than those reported. Mr. McCord's share would have been $200,000 in each of those five months, or $1,000,000 in all, rather than the $90,000 Plus Brand paid.

59. The payments also fell well short of the promised return. Twenty-two percent per year on $2,000,000 is about $36,667 per month. Plus Brand paid $15,000 or $20,000.

60. The five statements report $90,000 in total payments. Plus Brand has paid Mr. McCord no royalties for any month after May 2024. It has never delivered the required monthly reports of Gross Sales, and it has never provided any required accountant's review or adjustment.

61. Mr. McCord read the statements as showing that his royalty investment was performing and that Plus Brand was meeting its obligations. He relied on them when he made his May 23, 2024, January 2025, and June 16, 2025 purchases.

**G. The Mayweather announcement**

62. On March 17, 2025, Plus Brand emailed Mr. McCord, from info@plusbrand.com, a press release titled "Floyd Mayweather Jr Executes Strategic $30 Million Equity Investment in Plus Brand Industries Inc." The release announced "the closing of a strategic equity investment in Plus Brand® by iconic boxer and successful global entrepreneur Floyd Mayweather Jr." It then stated:

> The $30 million investment, completed on March 17th, makes Floyd Mayweather Jr. a significant minority shareholder of Plus Brand®. Completed at a pre-money valuation of $143.4 million, the investment paves the way for active participation in the future growth and direction of Plus Brand and its current and future product lines.

63. The release also stated that "[t]he closure of this strategic investment marks the first time that Plus Brand® has taken in meaningful outside capital." It quoted Willis: "This exciting new equity partnership with Floyd Mayweather ultimately came about because of the powerful way our technology, and the solution it provides, immediately resonated with him. Floyd's desire to participate in what we are building is a massive validation of the opportunity in front of Plus Brand®." It identified Gauer as "Plus Brand® Co-Founder and COO."

64. Plus Brand repeated these claims in sponsored content published on the Digital Journal website on March 24, 2025, which described "[t]he $30 million equity investment, completed in February," and stated that Plus Brand "is valued at $143.4 million pre-money."

65. The $143.4 million figure did not come from any investor. It came from an "Initial Valuation Analysis" that Fidelman & Company Inc. prepared for Plus Brand and completed on August 26, 2024. That analysis concluded that "Plus Brand Industries should likely be valued at $143.4 million." Fidelman reached that number by applying a revenue multiple to "[t]he projected first-year revenue of Plus Brand's Brand Portfolio segment," which it put at $42.69 million and drew from Plus Brand's own financial model. The Mayweather term sheet then used Fidelman's figure to set Plus Brand's "current share price" at $2.39, which is $143.4 million divided by the 60,000,000 shares the term sheet said were outstanding. At that price, the 12,605,042 warrant shares are worth about $30 million. The announced "$30 million investment" was therefore not money Plus Brand received. It was the value Plus Brand assigned, using its own projections, to the shares it promised Mayweather Promotions for promotional services.

66. The announcement was false and misleading. Neither Floyd Mayweather Jr. nor Mayweather Promotions agreed to pay Plus Brand anything. Under the term sheet, Mayweather

Promotions was to receive a warrant, exercisable in thirds over three years, in exchange for promotional services. Mayweather was not a "significant minority shareholder" on March 17, 2025. The statement that the transaction was "the first time that Plus Brand® has taken in meaningful outside capital" was also false. By then, Plus Brand had taken $2,950,000 from Mr. McCord alone and had reported $6,775,000 in Unit sales to the Securities and Exchange Commission.

67. Plus Brand's own valuation firm described the transaction as the issuance of warrants, not a purchase of shares for cash. In a report addressed to Willis and issued on June 13, 2025, Scalar, LLC valued Plus Brand's common stock as of April 30, 2025 for tax and accounting purposes. Scalar relied on a "recent Series Seed Warrants equity sale," dated March 13, 2025, of 12,605,042 warrants with a strike price of $0.00001, and assigned those warrants a value of $30,000,000. Scalar did not independently verify that figure. It relied on financial data, term sheets, and a capitalization summary that Plus Brand's management supplied.

68. Plus Brand's officers have since admitted that no investment of that size occurred. On May 23, 2025, in an update to royalty holders that he sent to Mr. McCord with a copy to Willis, Gauer wrote that the Mayweather investment "involves a cash component and a brand ambassador component and while the cash investment has not yet been completed, communication is excellent and a path to completion has been created." On October 21, 2026, Willis wrote: "There has been no $10 million or $15 million investment in the company." Willis had already written, on October 3, 2026, that for "about the last 18 months" he and his wife "have remained financially committed to the company," and that without "extraordinary founder support" the Company "would likely have closed." By his account, Plus Brand came to depend on its founder's support in about April 2025, one month after it announced that it had closed a

$30 million equity investment. Willis also wrote that, as Plus Brand had told its partners in April 2026, the Company had "operated under significant capital constraints for approximately 18 to 24 months." Measured from April 2026, that period began between April and October 2024. That was before Plus Brand sold Mr. McCord the Note, 16 more Units, and 4,000,000 more shares of preferred stock in 2025.

69. In the alternative, if a $30,000,000 equity investment did close in February or March 2025, it was a Qualified Financing under Section 6.5 of the October 2023 and January 2024 Royalty Agreements, of which Plus Brand gave Mr. McCord no notice, and it was "an initial third party equity investment of $15,000,000" under Section 1 of the Note, which made the Note due in full.

70. Gauer's update made other promises to royalty holders. He wrote that "you are guaranteed to receive your annual 22% return, regardless of what has been paid out to date," and that "before your principal is paid back in full you will have received a 22% annual return for the full period of time that your money was invested with Plus Brand." He wrote that the Company "should be positioned to commence royalty payments for the month of July" and that "the royalty pool will begin growing and paying out to holders again, likely beginning in July." And he wrote that "[e]ach royalty investor receives warrants to be able to participate in the first future equity raise (Series A)," at "a fixed 50% discount" that would let a royalty holder "walk into a 100% return immediately on the equity side." Plus Brand has paid no royalties for July 2025 or any later month. Only Mr. McCord's January 2025 and June 2025 Royalty Agreements provide for warrants, and those warrants may be exercised only after Plus Brand closes an equity financing of at least $50,000,000. Plus Brand has closed no such financing. The capitalization

table Plus Brand gave its valuation firm also lists no warrants other than the 12,605,042 issued in the Mayweather transaction.

71. Twenty-four days after Gauer's update, on June 16, 2025, Plus Brand sold Mr. McCord 500,000 more shares of preferred stock and, under a separate Royalty Agreement, 2 more Units for $50,000. Mr. McCord relied on the announcement and on Gauer's update in making that purchase. No one told him that the term sheet Willis had signed provided for no cash at all, or that Plus Brand's capitalization table did not include his preferred stock.

**H. Plus Brand's records omit Mr. McCord's preferred stock**

72. Scalar's report includes a capitalization table for Plus Brand as of April 30, 2025, which Scalar drew from a Company file titled "Plus Brand Industries, Inc. -- Cap Table." The table lists 41,754,202 shares of common stock, 12,605,042 Series Seed Warrants, and an option pool of 24,422,269 shares. It lists no Class A Preferred Stock. The only preferred stock it mentions is a single share of "Series Seed" stock, the class underlying the Mayweather warrants, which it includes "for modeling purposes only," and it states that "[n]o Series Seed shares are currently outstanding." It does not list Mr. McCord. The report also lists Plus Brand's debt as $0, although Plus Brand had issued Mr. McCord the $2,950,000 Note three months before the valuation date.

73. By April 30, 2025, Plus Brand had signed four agreements selling Mr. McCord preferred stock. Plus Brand either never issued and recorded those shares or concealed them from its valuation firm. Either way, the capitalization table contradicts Willis's October 2023 promise that Mr. McCord was "receiving 8,000,000 preferred shares."

**I. Plus Brand reassures Mr. McCord as the Company fails**

74. On October 31, 2025, Gauer wrote to Mr. McCord, with a copy to Willis, that "a buyer is now at the table for the acquisition of Plus Brand Industries Inc." He continued: "Our

records confirm your total investment of $3,000,000.00 USD, representing 15% preferred stock in Plus Brand Industries Inc." He explained that "[d]ue to the company's rapid growth and the varied nature of earlier documentation, the legal team will be issuing new, consolidated final paperwork reflecting your verified equity investment and percentage of ownership," and that "[t]he legal team will circulate your finalized documentation and payout details in the coming days." Plus Brand never sent that paperwork.

75. Three days later, on November 3, 2025, Willis wrote to Mr. McCord that he had "a crucial meeting with BOA and the buyers/investors" that afternoon and that Bank of America "is aligned with structuring this as a true partnership, where they would take 33.3% of the company, along with a board seat and full voting rights." In the same email, he wrote that "our essential services are being systematically shut off" and asked Mr. McCord for "a minimum of $60,000 in the bank today" as "a one-week bridge."

76. Gauer's and Willis's emails were false and misleading. Plus Brand's own capitalization table did not record Mr. McCord's preferred stock, no acquisition or Bank of America partnership has closed, and the "final paperwork" never came. The emails were meant to keep Mr. McCord from acting on his rights, and they had that effect.

**J. Mr. McCord's demands and Willis's admissions**

77. Beginning on April 20, 2026, Mr. McCord asked Plus Brand in writing for its financial statements and corporate records. On April 21, 2026, the Company acknowledged his request and his status as a preferred shareholder, said it would respond in good faith, and asked him for a written statement of his purpose and a signed confidentiality agreement. Mr. McCord sent his statement of purpose on May 8, 2026, agreed to review the Company's confidentiality agreement, and followed up on May 14 and July 25, 2026. Plus Brand never sent a confidentiality agreement, produced nothing, and stopped responding.

78. On October 3, 2026, Willis sent shareholders and partners a "Founder's Update." He wrote that Plus Brand's beverage business had required "substantial continuing capital" and that "[t]he company ultimately exhausted the capital available to sustain that model." He wrote that Plus Brand "should not have survived," that it was rebuilding "from a negative position, with depleted capital, continuing obligations, significant professional expenses," and that of the "financing, restructuring, licensing, and sale opportunities" it had considered, "[n]one resulted in a completed transaction." He also wrote that the Company's work included "reviewing ownership and capitalization records" and "addressing outstanding obligations."

79. On October 17, 2026, Mr. McCord sent Plus Brand a written demand for reports, financial statements, and records, by email and by certified mail to both its Sheridan and Madison Heights addresses. Among other things, he asked Plus Brand to confirm whether it had received the $15,000,000 equity investment described in the Note, whether an Event of Default under Section 3(a) of the Note had occurred, and whether his preferred stock was recorded on its books.

80. On October 21, 2026, Willis responded. He wrote that "the company has undergone a major strategic pivot to protect its core technology, along with a full corporate restructuring," and that he and his wife, Giovanna, "have personally funded and supported the company throughout this period." He then wrote:

> - There has been no $10 million or $15 million investment in the company.
> - There has been no new outside investment in the company since my October 3, 2026 Founder's Update. Any funding since then has come from Giovanna and me, with input from our legal counsel.
> - The company has had no revenue since its last communication to shareholders.

81. Willis added that "[o]ur outside advisors and corporate counsel are rebuilding the company's financial records and capitalization structure to reflect the new corporate structure," that "[a]nything provided before that work is complete would be incomplete," and that the Company would provide "a formal update on capitalization, governance, and ownership to all shareholders before January 1, 2027." He referred Mr. McCord's other requests to the Company's counsel.

**K. Willis dominates Plus Brand**

82. Willis dominates Plus Brand, and Plus Brand is grossly undercapitalized. On information and belief:

(a) Plus Brand's Wyoming address is a mail address. The Company operates, answers its telephones, and receives investor money in Michigan, and its documents give two different suite numbers for its Wyoming address.

(b) Willis personally solicited Mr. McCord, signed every agreement for the Company, and controlled its communications with investors.

(c) Plus Brand has not kept adequate corporate records. It sold Mr. McCord preferred stock that its capitalization table does not reflect; it recited payment for that stock in "royalty credit" that its Royalty Agreements say cannot be consideration for stock; it prepared an unsigned stock certificate; and its May 2024 stock documents were signed "Chad Willia," while the companion Royalty Agreement, signed one minute later, reads "Chad Willis." Willis now concedes that the Company's "financial records and capitalization structure" are being "rebuil[t]." Plus Brand's own documents also disagree about how many shares it has issued. The January 2025 Mayweather term sheet recites 60,000,000 shares outstanding.

The capitalization table Plus Brand supplied to Scalar three months later shows 41,754,202 shares of common stock and no other outstanding stock.

(d) On information and belief, Plus Brand did not obtain the corporate authority needed to issue the preferred stock it sold Mr. McCord.

(e) Plus Brand cannot pay its obligations. It told Mr. McCord in November 2025 that its "essential services are being systematically shut off." Willis has since written that the Company "exhausted the capital available to sustain" its beverage business, is rebuilding "from a negative position, with depleted capital, continuing obligations, significant professional expenses," has relied on "extraordinary founder support" from Willis and his wife for about eighteen months, and "has had no revenue since its last communication to shareholders."

83. Willis therefore had the power to control, and did control, Plus Brand's sales of securities to Mr. McCord and the statements Plus Brand made to him in connection with those sales.

**L. Defendants acted with scienter**

84. Willis knew, or was severely reckless in not knowing, that his statements and the Company's were false or misleading. Among other things:

(a) Willis signed the Mayweather term sheet and knew that Mayweather was receiving a warrant for services rather than investing $30,000,000 in cash. He nonetheless approved, and is quoted in, a press release announcing a completed "$30 million investment." He was also copied on Gauer's May 23, 2025 update, which told royalty holders that the investment "involves a cash component."

(b) As President and Chief Executive Officer, Willis controlled Plus Brand's records of its stock ownership. He knew that the Company had not recorded the preferred

stock he had promised Mr. McCord, and the capitalization table Plus Brand supplied to Scalar came from management.

(c) Willis knew Plus Brand's actual sales, and he knew that the payments reported in the royalty statements were a "baseline" amount that did not reflect 10 percent of product sales.

(d) Willis knew of Rose's role in soliciting investors, including Mr. McCord. He paid Rose about $1,000,000 over three years, and he complained to Mr. McCord that Rose had brought in investors who were not accredited. On information and belief, he also knew that Rose was barred by FINRA and was not registered in Texas.

(e) Willis had a strong motive to mislead. Plus Brand depended on investor money like Mr. McCord's to operate, and by November 2025 its essential services were being shut off.

85. Gauer signed each royalty statement and knew that the statements omitted Plus Brand's Gross Sales and reported a "baseline monthly return" unrelated to sales. He also signed the 2023 statements displayed in the royalty deck, under which Plus Brand paid out more than its royalty pool. And by May 23, 2025, he knew that the Mayweather "cash investment ha[d] not yet been completed," although the March 17, 2025 release, which identified him as Co-Founder and COO, had announced a "$30 million investment, completed on March 17th." As Co-Founder and Chief Operating Officer, he knew or was reckless in not knowing that the Company's capitalization table did not record Mr. McCord's preferred stock when he wrote on October 31, 2025 that the Company's "records confirm" it.

86. Rose knew that he was barred by FINRA and was not registered to sell securities in Texas. He nonetheless solicited Mr. McCord, presented himself as Plus Brand's ambassador for investor relations, caused the Decks to be sent to Mr. McCord, and steered him to Willis, all without disclosing either fact or the payments Willis has said he made to Rose.

**M. Reliance, discovery, and loss**

87. Mr. McCord relied on the statements described above in deciding to make each of his purchases. The statements were made to him personally, in response to his own questions or in documents addressed to him, and they concerned facts within Defendants' exclusive knowledge. Mr. McCord would not have invested, or would not have continued to invest, had he known the truth.

88. Defendants' fraud consisted in large part of omissions of material facts that they had a duty to disclose, including Rose's FINRA bar, lack of registration, and compensation, Willis's felony conviction and the Michigan Order of Prohibition, Plus Brand's actual Gross Sales, the source of the royalty payments, the nature of the Mayweather transaction, and Plus Brand's failure to record Mr. McCord's preferred stock.

89. Mr. McCord's reliance was reasonable. Plus Brand sold the preferred stock and the Note outside the Memorandum, so whatever the Memorandum disclosed could not have corrected the statements made to induce those purchases. Plus Brand and Willis also kept the information needed to test their statements, including Plus Brand's sales and stock records, to themselves and refused Mr. McCord's written requests for it.

90. Mr. McCord did not discover, and could not reasonably have discovered, the facts constituting Defendants' violations, including their scienter, until October 2026. Plus Brand concealed its Gross Sales figures and refused his requests for records. It assured him in May 2025 that his 22 percent return was "guaranteed" and that royalty payments would resume in

July, and in October and November 2025 that his ownership had been confirmed and that a sale of the Company was imminent.

91. The truth emerged through Willis's October 3 and October 21, 2026 communications, which disclosed that the Company had received no investment of $10 million or more, had no revenue, and was purportedly rebuilding its financial and capitalization records. Those disclosures revealed the falsity of the statements described above, and Mr. McCord's investments have lost all or nearly all of their value. Mr. McCord has been damaged in an amount to be proven at trial, but not less than $2,910,000, the difference between what he paid and what he has received, exclusive of interest and other entitlements.

92. All Defendants used the means and instrumentalities of interstate commerce, including interstate email, telephone calls, and wire transfers between Texas and Michigan, in connection with the conduct described in this Complaint.

## V. CLAIMS FOR RELIEF

### COUNT I
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5
(Against Chad Willis, Adam Gauer, and Noel A. Rose)

93. Mr. McCord incorporates every preceding paragraph of this Complaint.

94. In connection with Mr. McCord's purchases of the Units, the preferred stock, and the Note, Willis, Gauer, and Rose, directly and indirectly, by use of the means and instrumentalities of interstate commerce, (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit on Mr. McCord. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

95. The untrue statements and misleading omissions on which this Count rests, and the reasons each was false or misleading, are set out in Parts IV.B, IV.C, IV.F, IV.G, and IV.H. They include:

(a) the Decks' representations that royalty investors were "ALREADY SEEING MONTHLY RETURNS" paid from 10 percent of sales, and Willis's October 30, 2023 statements that Mr. McCord was "receiving 8,000,000 preferred shares," that the Company's forecasts exceeded its projections "by almost 100% or more," that the Company was "in the middle of our multiple patent valuations, expected to exceed one billion," and that the investment carried "absolutely no risk";

(b) the February through June 2024 royalty statements, which presented fixed "baseline" payments as royalties while concealing Gross Sales figures that equaled the money raised from investors;

(c) the March 17, 2025 announcement of a completed "$30 million" equity investment and of "the first time that Plus Brand® has taken in meaningful outside capital";

(d) Gauer's May 23, 2025 statements that the Mayweather investment involved a "cash component" on "a path to completion," that royalty payments would resume in July 2025, and that each royalty investor would receive warrants to participate in "the first future equity raise (Series A)" at "a fixed 50% discount," when Mr. McCord's 2023 and 2024 Royalty Agreements provided for no warrants and his 2025 agreements provided for warrants exercisable only after a financing of at least $50,000,000;

(e) the omission of Rose's FINRA bar, his lack of registration, and his role in the offering, and of Willis's felony conviction and the Michigan Order of Prohibition; and

(f) the omission, before the January 24, 2025 and June 16, 2025 purchases, that Plus Brand had not issued or recorded the preferred stock it had already sold Mr. McCord.

96. Willis made the statements in his own emails and the statements attributed to him in the March 17, 2025 release. As Plus Brand's President and Chief Executive Officer, he also had ultimate authority over the content and communication of the Company's royalty statements and press release. Gauer made the royalty statements, which he signed, and the statements in his May 23, 2025 update. Plus Brand made each of these statements through its officers and in the Decks.

97. Rose is liable under Rule 10b-5(a) and (c). With intent to defraud or with severe recklessness, he solicited Mr. McCord's investment; caused the Decks, which Rose said contained "all your answers," to be sent to him; routed his questions to Willis for answers that Rose knew would be used to induce the purchase; offered him preferred stock as "a special offer to you only" outside the Memorandum; and concealed his FINRA bar, lack of registration, and compensation.

98. Defendants acted with scienter, as alleged in Part IV.L.

99. Mr. McCord justifiably relied on Defendants' statements and omissions, as alleged in Part IV.M.

100. Defendants' fraud caused Mr. McCord's losses. When the truth emerged in October 2026, it revealed that the investments Mr. McCord had been induced to make were worth little or nothing.

101. This Count is timely. Mr. McCord brings it within two years after discovering the facts constituting the violation and within five years after each violation. 28 U.S.C. § 1658(b).

102. The non-reliance and integration provisions of the Royalty Agreements do not bar this Count. Section 29(a) of the Exchange Act provides that "[a]ny condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder . . . shall be void." 15 U.S.C. § 78cc(a).

103. Willis, Gauer, and Rose are jointly and severally liable to Mr. McCord for his damages, including rescissory damages, in an amount to be proven at trial.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act**
(Against Chad Willis, Adam Gauer, and Cory Willis)

104. Mr. McCord incorporates every preceding paragraph of this Complaint.

105. Plus Brand violated Section 10(b) and Rule 10b-5. Through Willis, Gauer, and its other officers, and in the Decks, it made the untrue statements and misleading omissions identified in Count I, with the scienter alleged in Part IV.L, in connection with Mr. McCord's purchases of its securities, and those violations caused his losses. Plus Brand is not a party to this action, but its violation is the predicate for each Defendant's liability under this Count.

106. Willis, Gauer, and Cory Willis each directly or indirectly controlled Plus Brand within the meaning of Section 20(a). Willis is its founder, President, and Chief Executive Officer and signed every agreement at issue. Gauer is its Co-Founder and Chief Operating Officer and signed the royalty statements. Plus Brand's amended Form D, which Willis signed, identifies each of the three as an executive officer and a director of the Company. Plus Brand's corporate

deck also presented Cory Willis to prospective investors, including Mr. McCord, as a member of its "Management Team." Each had the power to direct Plus Brand's management and policies, including the content of its statements to investors and its sales of securities.

107. Under 15 U.S.C. § 78t(a), Willis, Gauer, and Cory Willis are each liable jointly and severally with, and to the same extent as, Plus Brand.

**COUNT III**
**Sale by Means of Untruth or Omission, Texas Securities Act § 4008.052**
(Against Chad Willis, Adam Gauer, and Noel A. Rose)

108. Mr. McCord incorporates every preceding paragraph of this Complaint.

109. Plus Brand sold securities to Mr. McCord. Willis and Rose offered those securities to him by soliciting his purchases, motivated at least in part by their own financial interests and Plus Brand's. Gauer offered the securities Mr. McCord bought on June 16, 2025. Through his May 23, 2025 update, which promised royalty holders a guaranteed 22 percent return, renewed royalty payments, and discounted warrants, Gauer solicited Mr. McCord's further investment, motivated at least in part by his own financial interests and Plus Brand's.

110. Willis, Gauer, and Rose offered the securities "by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading." Tex. Gov't Code § 4008.052(a). The untrue statements and omissions include those listed in Count I.

111. Liability under § 4008.052 does not depend on reliance or on whether the securities or transactions were exempt from registration. *Id.*

112. Mr. McCord did not know of the untruths or omissions. Willis, Gauer, and Rose knew of them or, in the exercise of reasonable care, could have known of them.

113. Mr. McCord sues for rescission and tenders his securities. *Id.* §§ 4008.052(b)(1), 4008.056(a). He is entitled to recover the consideration he paid, plus interest at the legal rate, less

income received, together with his costs and reasonable attorney's fees. *Id.* §§ 4008.056(a), 4008.060.

114. This Count is timely. Mr. McCord brings it within three years after discovering the untruths and omissions and within five years after each sale. *Id.* § 4008.062(b).

115. No provision of Plus Brand's agreements bars this Count. "A condition, stipulation, or provision is void if it binds a buyer . . . of a security . . . to waive compliance with this title." *Id.* § 4008.002.

**COUNT IV**
**Control Person and Aider Liability, Texas Securities Act § 4008.055**
(Against Chad Willis, Adam Gauer, Cory Willis, and Noel A. Rose)

116. Mr. McCord incorporates every preceding paragraph of this Complaint.

117. Plus Brand is liable to Mr. McCord under Tex. Gov't Code §§ 4008.051 and 4008.052, as alleged in this Count. Plus Brand is not a party to this action, but its liability is the predicate for each Defendant's liability under this Count.

118. Plus Brand offered and sold securities to Mr. McCord in Texas. Mr. McCord lived in Texas, Plus Brand directed its offers to him there, and he accepted them there.

119. An issuer "who directly or through any person or company, other than a registered dealer, offers for sale, sells, or makes sales of the issuer's own securities is deemed a dealer and shall comply with this title." Tex. Gov't Code § 4001.056(b). A dealer "may not, directly or through the dealer's or other person's or company's agents, offer for sale, sell, or make a sale of any securities in this state unless the dealer or other person or company is first registered." *Id.* § 4004.051.

120. Plus Brand sold its own securities to Mr. McCord directly and through Rose. Neither Plus Brand nor Rose was registered as a dealer in Texas, and Plus Brand did not sell through a registered dealer.

121. On information and belief, no exemption applies to any of the sales. Texas requires an issuer relying on Rule 506 to file its Form D notice with the State Securities Board, through the Electronic Filing Depository maintained by the North American Securities Administrators Association, within 15 days after its first sale in Texas. Plus Brand made no state notice filing, in Texas or any other state, for either its Form D or its amended Form D. The Royalty Agreements invoke Rule 506(c), which permits sales only to accredited investors. 17 C.F.R. § 230.506(c)(2)(i). Willis has told Mr. McCord that Rose brought investors who were not accredited into the Company.

122. Plus Brand did not offer the preferred stock or the Note under the Memorandum, and neither appears in any Form D. Rule 506 was also unavailable because Plus Brand used a barred solicitor. The rule offers no exemption if any person paid for soliciting purchasers is barred from association with a member of a registered national securities association. 17 C.F.R. § 230.506(d)(1), (d)(1)(vi). On information and belief, Plus Brand paid Rose for soliciting purchasers, and FINRA has barred him. If Rose's bar predates September 23, 2013, Plus Brand had to disclose it to Mr. McCord in writing a reasonable time before each sale, and it never did. *Id.* § 230.506(d)(2)(i), (e).

123. Plus Brand is therefore liable to Mr. McCord under Tex. Gov't Code § 4008.051(a)(1) for the consideration he paid, at least $3,000,000, plus interest at the legal rate from the date of each payment, less the $90,000 he received. *Id.* § 4008.056(a).

124. Plus Brand also sold its securities to Mr. McCord by means of the untrue statements and omissions identified in Counts I and III. It may not defend on the ground that it could not have known of them through reasonable care because they appeared in writings it prepared and delivered in selling the securities, including the Decks, Willis's October 30, 2023

email, the royalty statements, the March 17, 2025 release, and Gauer's May 23, 2025 update. *Id.* § 4008.052(a), (d)(2). Plus Brand is therefore liable to Mr. McCord under § 4008.052 as well.

125. Willis, Gauer, and Cory Willis each directly or indirectly controlled Plus Brand, for the reasons alleged in Count II. Each is liable "jointly and severally with the . . . issuer and to the same extent as the . . . issuer." Tex. Gov't Code § 4008.055(a). None of them can show that he "did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." *Id.* § 4008.055(b).

126. Rose, with intent to deceive or defraud or with reckless disregard for the truth or the law, materially aided Plus Brand in selling securities to Mr. McCord. He solicited the purchases, caused the Decks to be sent to Mr. McCord, steered him to Willis, and concealed his bar, his lack of registration, and his compensation. Rose is liable jointly and severally with Plus Brand and to the same extent. *Id.* § 4008.055(c).

127. In the alternative, Willis and Gauer materially aided Plus Brand's violations with intent to deceive or defraud or with reckless disregard for the truth or the law, and they are liable under § 4008.055(c).

128. Each Defendant is liable under this Count jointly and severally with Plus Brand and to the same extent as Plus Brand. Mr. McCord sues for rescission and tenders the Units, the preferred stock, and the Note, and any other security of the same class and series that he holds. He is entitled to recover the consideration he paid, plus interest at the legal rate from the date of each payment, less income received, together with his costs and reasonable attorney's fees. *Id.* §§ 4008.055, 4008.056(a), 4008.060.

129. This Count is timely. To the extent it rests on Plus Brand's sales by an unregistered dealer, Mr. McCord brings it within three years after the date of each sale. *Id.* §

4008.062(a)(1). To the extent it rests on Plus Brand's untruths and omissions, he brings it within three years after discovering them and within five years after each sale. *Id.* § 4008.062(b).

130. No provision of Plus Brand's agreements bars this Count. "A condition, stipulation, or provision is void if it binds a buyer . . . of a security . . . to waive compliance with this title." *Id.* § 4008.002.

**COUNT V**
**Fraud and Fraudulent Inducement**
(Against Chad Willis, Adam Gauer, and Noel A. Rose)

131. Mr. McCord incorporates every preceding paragraph of this Complaint.

132. Willis, Gauer, and Rose made the material misrepresentations and concealed the material facts as identified in Count I.

133. They knew the representations were false, or made them recklessly without knowledge of their truth. They had a duty to disclose the concealed facts because they made partial disclosures that created a false impression, because the facts were within their exclusive knowledge, and, as to Willis and Gauer, because each was an officer of the corporation whose shares he was selling.

134. Willis's promises that Mr. McCord was "receiving 8,000,000 preferred shares" and would receive royalties "each month" producing "a 22% return" were promises of future performance that, on information and belief, Willis had no intention of keeping when he made them.

135. Defendants intended Mr. McCord to rely on these misrepresentations and omissions in buying Plus Brand's securities. He did rely on them, and his reliance was justifiable for the reasons alleged in Part IV.M.

136. As a result, Mr. McCord suffered damages in an amount to be proven at trial. Because Defendants acted with fraud and malice, Mr. McCord is also entitled to exemplary damages.

**COUNT VI**
**Negligent Misrepresentation**
(Against Chad Willis and Adam Gauer)

137. Mr. McCord incorporates every preceding paragraph of this Complaint.

138. In the course of their business, and in transactions in which they had a pecuniary interest, Willis and Gauer supplied false information to Mr. McCord for his guidance in deciding whether to buy Plus Brand's securities, including the statements identified in Count I.

139. Willis and Gauer failed to exercise reasonable care or competence in obtaining and communicating that information.

140. Mr. McCord justifiably relied on the information and suffered pecuniary loss as a result, in an amount to be proven at trial.

**COUNT VII**
**Statutory Fraud in a Stock Transaction, Tex. Bus. & Com. Code § 27.01**
(Against Chad Willis and Adam Gauer)

141. Mr. McCord incorporates every preceding paragraph of this Complaint.

142. Each of Mr. McCord's purchases of Plus Brand preferred stock was a "transaction involving . . . stock in a corporation." Tex. Bus. & Com. Code § 27.01(a).

143. To induce Mr. McCord to enter into the Preferred Stock Subscription Agreements, Willis and Gauer made false representations of past or existing material fact, including Willis's October 30, 2023 statements about the Company's forecasts and patent valuations, the royalty statements' presentation of fixed payments as royalties, the March 17, 2025 announcement of a completed "$30 million" equity investment, and Gauer's May 23, 2025

update. Willis also made material false promises, including the promise that Mr. McCord was "receiving 8,000,000 preferred shares," with no intention of fulfilling them.

144. Mr. McCord relied on these representations and promises in entering into each Preferred Stock Subscription Agreement.

145. Willis and Gauer are liable to Mr. McCord for his actual damages. *Id.* § 27.01(b). Because they made the representations and promises with actual awareness of their falsity, they are also liable for exemplary damages. *Id.* § 27.01(c). They are liable for Mr. McCord's reasonable and necessary attorney's fees, expert witness fees, costs of deposition copies, and costs of court. *Id.* § 27.01(e).

**COUNT VIII**
**Breach of Fiduciary Duty**
(Against Chad Willis and Adam Gauer)

146. Mr. McCord incorporates every preceding paragraph of this Complaint.

147. Willis and Gauer, as officers and directors of Plus Brand, a Wyoming corporation, owe Mr. McCord, as a holder of its preferred stock, duties of loyalty, care, and good faith, including a duty not to withhold from him material information about the corporation's finances and his own shares. This Count rests on Mr. McCord's rights as a preferred shareholder, not on his rights as a holder of Units or of the Note.

148. Willis and Gauer breached those duties by, among other things:

(a) failing to cause Plus Brand to issue and record Mr. McCord's preferred stock, and omitting it from the capitalization table the Company supplied to its valuation firm;

(b) misrepresenting Mr. McCord's ownership and the Company's prospects in October and November 2025 to dissuade him from enforcing his rights;

(c) withholding from Mr. McCord the records and information about his own shares and investment that he requested and was entitled to receive.

149. These breaches injured Mr. McCord directly and individually, apart from any injury to Plus Brand. They concern his own shares, his own place on the Company's capitalization table, and the information owed to him, and any recovery belongs to him rather than to the corporation.

150. As a result, Mr. McCord suffered damages in an amount to be proven at trial. Because Willis and Gauer acted willfully and in bad faith, Mr. McCord is also entitled to exemplary damages.

## VI. ALTERNATIVE PLEADING AND CONDITIONS PRECEDENT

151. Under Federal Rule of Civil Procedure 8(d)(2) and (3), Mr. McCord pleads his claims in the alternative and regardless of consistency. In particular, he seeks rescissory relief under Counts III and IV and, in the alternative, damages. He will elect his remedies before judgment and does not seek a double recovery.

152. All conditions precedent to Mr. McCord's claims have been performed, have occurred, or have been excused.

## VII. PRAYER FOR RELIEF

Mr. McCord asks the Court to enter judgment in his favor and against Defendants, jointly and severally to the extent permitted by law, and to award the following relief:

(a) the consideration Mr. McCord paid for the Units, the preferred stock, and the Note, at least $3,000,000, plus interest at the legal rate from the date of each payment, less income received, under Tex. Gov't Code §§ 4008.052, 4008.055, and 4008.056;

(b) in the alternative, actual and rescissory damages in an amount to be proven at trial;

(c) exemplary damages under Tex. Bus. & Com. Code § 27.01(c) and the common law;

(d) reasonable attorney's fees, expert witness fees, and costs under Tex. Gov't Code § 4008.060 and Tex. Bus. & Com. Code § 27.01(e);

(e) prejudgment and post-judgment interest at the highest rate allowed by law; and

(f) all other relief the Court finds just.

## VIII. JURY DEMAND

Under Federal Rule of Civil Procedure 38, Mr. McCord demands a trial by jury on all issues so triable.

Dated: October 30, 2026.

Respectfully submitted,

/s/ Garland Murphy
Garland Murphy
Lead Attorney
Texas Bar No. 24058010
Rick Houghton (*pro hac vice forthcoming*)
Texas Bar No. 24121678
Chris Chambers (*pro hac vice forthcoming*)
Texas Bar No. 24149615
MURPHY BALL STRATTON LLP
1001 Fannin, Suite 720
Houston, Texas 77002
(412) 721-7482
lmurphy@mbssmartlaw.com
rhoughton@mbssmartlaw.com
cchambers@mbssmartlaw.com

*Attorneys for Plaintiff Stephen McCord*